IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| GERRY NILES FIRESTONE, ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION 09-00719-KD-N |
| ) | |
| RICHARD C. GIBSON and ) | |
| BILLY B. INC., ) | |
|     Defendants. ) | |

**ORDER**

This matter is before the Court on the Defendants' joint Motion for Summary Judgment (Docs. 36, 37, 38), Plaintiff's Response (Doc. 40), the Defendants' Motion to Strike (Doc. 41), and the Defendants' Reply (Doc. 42).

**I.    Procedural Background**

On November 3, 2009, Plaintiff Gerry Niles Firestone ("Firestone") initiated this action by filing a complaint against Defendants Richard C. Gibson ("Gibson") and Billy B. Inc. ("BB"), alleging claims under the Jones Act (Count One), for maintenance and cure (Count Two), unseaworthiness (Count Three), punitive damages (Count Four), and negligence (Count Five) -- all stemming from a September 2008[1] accident which occurred while Firestone was employed as a crewman on the fishing vessel F/V BILLY B ("the vessel"). (Doc. 1). On September 30, 2010, the Defendants jointly moved for summary judgment. (Docs. 36, 37, 38). On November 10, 2010, the court heard oral argument on the Defendants' motion.

---

[1] Firestone alleged that the accident and injury occurred in September 2009 in his Complaint; however, Firestone testified in his deposition that the accident occurred in September 2008.

1

## II. Factual Background[2]

### A. The parties

Firestone is a resident of Elberta, Alabama. (Doc. 1 at ¶2).

Defendant Gibson exclusively operates and controls the F/V BILLY B, a commercial fishing boat, out of Baldwin County, Alabama and other Gulf Coast ports. (Doc. 38 at 4 (Aff. Gibson)). Defendant BB is a Florida corporation conducting business in Baldwin County, Alabama; it has been wholly owned by Defendant Gibson since 2000. (Id.) Defendant BB is the sole owner of the vessel the F/V BILLY B, a bottom fishing boat that harvests fish for commercial sale within the navigable waters of the United States. (Doc. 1 at ¶¶5, 6).

### B. Firestone's Prior Medical History

Firestone has worked on fishing boats since he was a teenager. (Doc. 40-1 at 1-2 (Dep. Firestone at 18-25)). In **March 1991,** Firestone was severely injured in a motorcycle accident and suffered major injuries to his pelvis and lower extremity "from which he recovered and returned to work." (Doc. 40-3 at 1, 3). Subsequently, Firestone also suffered a workers' compensation injury in Georgia for which he received treatment. (Id.) See also Doc. 40-1 at 3 (Dep. Firestone at 28)).

On **June 5, 2006,** an Administrative Law Judge ("ALJ") concluded that Firestone was 100% disabled, beginning October 15, 2002, because he had a severe medical impairment to his right ankle including degenerative disease status post open reduction, internal fixation of pelvic and right ankle fractures with residual right foot drop. (Doc. 38 at 17-23 (6/5/06 Order)). The

---

[2] When ruling on a motion for summary judgment, the Court views "the evidence and all reasonable inferences in the light most favorable to the non moving party." Battle v. Board of Regents for Ga., 468 F.3d 755, 759 (11th Cir. 2006). Firestone is the non-movant.

ALJ found that these impairments cause significant limitation to Firestone's ability to perform basic work activities such that he is unable to sustain performance of even sedentary work. (Id.)

**C.     The Pre-Hire**

Sometime in **August 2008**, Firestone contacted Gibson and requested employment as a crewman on the F/V BILLY B. (Doc. 38 at 4 (Aff. Gibson); Doc. 28 at 26 (Dep. Firestone)). At that time, Gibson was acquainted with Firestone and was aware that he had owned and work on boats similar to the F/V BILLY B in the mid-1990s. (Id.)   When Firestone came to work on the F/V BILLY B, he was 100% disabled and had been for almost 6 years, but he did not tell Gibson this information. (Doc. 40-1 at 8 (Dep. Firestone at 136)). Firestone contends that Gibson "by virtue of his long relationship with Plaintiff, knew or should have known of Firestone's past medical conditions." (Doc. 40-3 at 3).

Gibson did not require a pre-employment physical as a prerequisite to hiring crewman for the vessel. Nor, did Gibson conduct an interview with Firestone to determine his physical fitness. Instead, Gibson relied on Firestone to tell him of any physical conditions he had that would affect his safety offshore and his ability to perform as a crewman. (Id.) Before hiring Firestone as a crewman, Firestone never told Gibson that he had been declared 100% disabled, or what the disability order findings included. (Id. at 5). Gibson contends that "[i]f Mr. Firestone had revealed any such information to me before I hired him, I never would have employed him as a crewman on the F/B BILLY B." (Id.)

**D.     The Accident**

In **late August 2008,** Firestone made one trip as a crewman on the F/V BILLY B; his first trip was made without incident. (Doc. 38 at 5 (Aff. Gibson)).

The second trip started on **September 5, 2008.** On the vessel, Firestone was assigned to the fishing station of the second reel back on the port side. (Doc. 38 at 40 (Dep. Firestone at 115)). Firestone asserts that on the second night out, **September 6, 2008**, as the vessel was anchored up and fishing, and as he was walking the boat rolled (from waves) and his right foot caught in the bird[3] that was positioned in the walkway. (Doc. 38 at 27-31, 34-39 (Dep. Firestone at 101-105, 109-114)). The trip ended on the morning of **September 9, 2008.**

On **September 9, 2008,** at 11:50 a.m., Firestone was treated at the South Baldwin Regional Medical Center's Emergency Room, at which time his chief complaint was severe pain and numbness in his right foot with an onset of the previous day. (Doc. 38 at 51-56). The medical record states "no trauma. Blue/cold foot since yesterday" with numbness and pain on movement. (Id. at 51). He reported his motor vehicle accident which crushed his ankle (pins) and that he normally has bad circulation. (Id.) The record stated "Arterial Infra[ ] occlusion . . . decreased morphine flow." (Id. at 52). The Clinical Impression was "RLE arterial insufficiency." (Id.) Firestone's Initial Assessment Form states that he complained of right foot pain with onset two days ago and stated that he "thinks he has a blood clot in foot because foot has been purple in color." (Doc. 38 at 55). On his assessment form, personnel noted that Firestone "denies injury to foot, states he started having pain 2 days ago . . . noted discoloration

---

[3] A bird is a device with a weighted head and wings that is hung from the outriggers of a fishing vessel such as the F/V BILLY B and dragged while the vessel is making headway or at anchor offshore to provide greater stability for the vessel. (Doc. 36 at 3 at n.5).

to toes yesterday, this am . . . noted discoloration up to ankle area[.]" (Id. at 56). He reported being disabled. (Doc. 38 at 68).

Shortly after, he was transferred by ambulance to Providence Hospital. The Providence Hospital medical records indicate that Firestone reported he was disabled and unemployed. (Doc. 38 at 60). Dr. William E. Johnson's report indicates that "Mr. Firestone has a long history of chronic injury to this [right lower] extremity. He was in a very serious motorcycle accident several years ago. He had a back injury, a pelvic fracture, and a fractured right ankle. All of these areas had operative intervention with hardware including the ankle and in fact his right foot, by his testimony, is always cold and is always somewhat tender and painful. In fact, at this point, he states that his appearance and sensation of the foot is just, about in its normal clinical state." (Id. at 62). Plaintiff was admitted for observation and scheduled for an angiogram the next day. (Id. at 63).

In his **September 16, 2008** discharge summary by Dr. Gregory S. McGee, it was noted that Firestone was admitted with a diagnosis of severe ischemia of the right foot and that he underwent a right femoral embolectomy, right iliac and popliteal thrombectomy and on-table angiogram. (Id. at 64). Firestone reported that "the pain that he was having was very similar to the pain he had a crush injury in a motorcycle accident years before." (Id.)

On **September 24, 2008,** Firestone went to the Mobile Infirmary where he underwent amputation of his right leg below the knee on **September 25, 2008.** (Doc. 38 at 73-84). In his report, he said that there had been no accident/event causing the injury. (Id.) Dr. Gregory S. McGee noted that he had peripheral vascular disease and gangrene of the right foot, and was noncompliant with diabetes care, and that Firestone's mother reported he "takes pain medication

5

because of his leg and has been doing that for a long time[.]" (Id. at 74). He reported that he is a former fisherman who has retired at age 44. (Id. at 76).

In **October 2008**, about one month after the vessel docketed (and after Gibson had repeatedly tried to reach Firestone but with no success), Gibson was able to reach Firestone via telephone to inquire about his status, and that is when he learned for the first time that he had his lower right leg amputated and that he was in rehabilitation in Birmingham. (Doc. 38 at 7 (Aff. Gibson)). According to Gibson, during that telephone conversation, Firestone told him that it was not his fault but that he had slept on the ice hold lid and a blood clot set up in his right leg because his legs were hanging down. (Id. at 7-8).

## III. Discussion

Summary judgment should be granted only if "there is no genuine issue as to any material fact and [ ] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[4] The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The party seeking summary judgment always bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on

---

[4] Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall be granted: "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

6

an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted). The mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Sec'y of the Dep't of Children & Family Serv., 358 F.3d 804, 809 (11th Cir. 2004), cert. den., 534 U.S. 1081 (2005).

**A.     Negligence, Unseaworthiness & Jones Act Counts**

Even assuming Firestone could prove negligence and that he injured his foot on the bird (twisting his right ankle) while employed on the vessel, Firestone concedes that he is unable to provide this Court with evidence to establish proximate causation (*i.e.*, that this injury, rather than his chronic medical condition, proximately caused his right leg to be amputated). Indeed, the medical evidence which has been submitted suggests a contrary finding. See e.g., (Doc. 38 at 51, 56) (South Baldwin Regional Medical Center ER record which states that Firestone reported that he had suffered "no trauma" and that he "denies injury to foot[]").

Accordingly, it is **ORDERED** that Firestone's claims for Jones Act (Count One), unseaworthiness (Count Three), general maritime law/punitive damages (Count Four) and negligence (Count Five) are hereby **DISMISSED with prejudice.** In light of the foregoing, it is further **ORDERED** that Defendant's motion to strike the affidavit of Mark King is **MOOT.**

**B.     Maintenance and Cure**

A shipowner is obliged to pay "[m]aintenance and cure" as a result of "the contract between the seaman and the shipowner or vessel, to pay a seaman, who is ill or injured while in the service of a ship, 'wages to the end of the voyage and subsistence, lodging and care to the point where the maximum cure attainable has been reached.'" Bloom v. Weeks Marine, Inc., 225 F. Supp. 2d 1334, 1335 (M.D. Fla. 2002).  As set forth in Thomas v. Carnival Corp., 573 F.3d 1113 (11th Cir. 2009), "'[m]aintenance and cure' is an ancient common-law maritime remedy for seamen who are injured while in the service of a vessel. Our circuit has described the action as follows:["]

> The seaman's action for maintenance and cure may be seen as one designed to put the sailor in the same position he would have been had he continued to work: the seaman receives a maintenance remedy, because working seamen normally are housed and fed aboard ship; he recovers payment for medical expenses in the amount necessary to bring him to the maximum cure; and he receives an amount representing his unearned wages for the duration of his voyage or contract period.

Id. at 1115 at n.2 (citing Flores v. Carnival Cruise Lines, 47 F.3d 1120, 1127 (11th Cir. 1995)). See also e.g., Gaspard v. Taylor Diving & Salvage Co., Inc., 649 F.2d 372, 375 (5th Cir. 1981);[5] Boudreaux v. United States, 280 F.3d 461, 468 (5th Cir. 2002).  In sum, "when a seaman is injured or becomes ill while employed aboard a vessel, he is entitled to daily subsistence [maintenance] and medical treatment [cure] until his maximum cure has been reached." Kasprik v. United States, 87 F.3d 462, 464 (11th Cir. 1996).  "[I]t does not matter for maintenance and cure purposes whether [the employer] had any hand in causing" the plaintiff's injury.  Flores, 47

---

[5] Decisions of the former Fifth Circuit rendered prior to October 1, 1981, are binding precedent on the Eleventh Circuit. Bonner v. City of Prichard, Alabama, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

F.3d at 1124.

Moreover, "[t]o recover in a maintenance and cure action, the seaman need not suffer from illness or injury that is causally related to his duties...." Id. at 1123. Instead, the Plaintiff must show that: 1) an injury or illness occurred while Plaintiff was in the service of the vessel on which the Plaintiff was employed as a seaman; and 2) the injury or illness occurred without willful misbehavior by Plaintiff. See, e.g., Stevens v. McGinnis, 82 F.3d 1353, 1357-1358 (6th Cir. 1996); Bloom, 225 F. Supp. 2d at 1335); Adams v. Texaco, Inc., 640 F.2d 618, 620 (5th Cir. 1981);[6] Garay v. Carnival Cruise Line, Inc., 904 F.2d 1527, 1530 (11th Cir. 1990). "[A] seaman will not lose his right to maintenance and cure unless he engages in positively vicious conduct- such as gross negligence or willful disobedience of orders." Garay, 904 F.2d at 1530 (internal quotes omitted); *accord* Flores, 47 F.3d at 1123 (maintenance and cure is available "as long as the seaman's incapacitation did not result from his own willful misconduct").

Further, "[a] seaman may recover maintenance and cure even for injuries or illnesses preexisting the seaman's employment unless that seaman knowingly or fraudulently concealed his condition from the vessel owner at the time he was employed." Jauch v. Nautical Services, Inc., 470 F.3d 207, 212 (5th Cir. 2006); McCorpen v. Central Gulf S.S. Corp., 396 F.2d 547, 548 (5th Cir. 1968). "[W]here a shipowner requires a seaman to submit to a pre-hiring medical examination or interview and the seaman intentionally misrepresents or conceals material medical facts, the disclosure of which is plainly desired, then he is not entitled to an award of maintenance and cure." McCorpen, 396 F.2d at 549. *However*, "[w]here the shipowner does not

---

[6] Decisions of the former Fifth Circuit rendered prior to October 1, 1981, are binding precedent on the Eleventh Circuit. Bonner v. City of Prichard, Alabama, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

require a pre-employment medical examination or interview, the rule is that a seaman must disclose a past illness or injury only when in his own opinion the shipowner would consider it a matter of importance. If the shipowner is unable to persuade the court or jury that the seaman could reasonably be expected to have considered his medical history a matter of importance, he [the defendant] will be liable if it is found that there existed reasonable grounds for the seaman's good-faith belief that he was fit for duty." McCorpen, 396 F.2d at 548-549. See also Kuithe v. Gulf Caribe Maritime, Inc., Slip Copy, 2010 WL 3419998, *9 (S.D. Ala. Aug. 26, 2010); Keys v. Halliburton Co., 1989 WL 54224, *2 (E.D. La. May 17, 1989). As noted in Wactor v. Spartan Transp. Corp., 27 F.3d 347, 352 at n.3 (8th Cir. 1994) (citing McCorpen): "In hiring scenarios where a seaman is not asked about his health or prior injuries, nondisclosure of such information will not be considered knowing or intentional [for purposes of exception to seaman's right to award of maintenance and cure] if the seaman held good-faith belief that he was fit for duty and that the shipowner could not consider past illness or injury important."

When not directly questioned about his medical status during pre-hire, a crewman's nondisclosure of his medical history is tied to his belief about his own fitness for duty on the vessel. "The question of the seaman's subjective belief only arises if he is not directly questioned about preexisting conditions." Guerra v. Arctic Storm, Inc., 2004 WL 3007097, *2 and n.2 (W.D. Wash. Aug. 4, 2004) (citing Burkert v. Weyerhaeuser Steamship Co., 350 F.2d 826, 831 n. 4 (9th Cir. 1965)). See also Evans v. Blidberg Rothchild Co., 382 F.2d 637 (4th Cir. 1967); McCorpen, 396 F.2d 547; West v. Midland Enters. Inc., 227 F.3d 613, 617 (6th Cir. 2000); Sulentich v. Interlake S.S. Co., 257 F.2d 316, 320 (7th Cir. 1958); Wactor v. Spartan Transp., Co., 27 F.3d 347, 352 (8th Cir. 1994). "In such cases a seaman who has a good faith belief that

he is fit for duty will not be denied maintenance and cure for failing to voluntarily disclose a prior medical condition." Guerra, 2004 WL 3007097 at *2. *Cf.* Sammon v. Central Gulf S.S. Corp., 442 F.2d 1028 (2d Cir. 1971); Couts v. Erickson, 241 F.2d 499 (5th Cir. 1957); Capone v. Boat St. Victoria, 1989 WL 47387 (D. Mass. 1989). As noted in Atlantic Sounding Co., Inc. v. Parker, Slip Copy, 2010 WL 2836130, *2 (E.D. La. Jul. 10, 2010):

> …. spontaneous disclosure is required when, "in the opinion of the seaman, the shipowner would consider them matters of importance." Capone v. Boat St. Victoria, 1989 WL 47387 at *6 (D.Mass 4/27/89); Lorenson v. Jenney Manufacturing Co., 155 F.Supp. 213 (D.Mass.1957). "The burden in this respect is on the shipowner, and it must be a substantial one." Id. Second, "[w]hen a seaman signs aboard, he must have a good faith belief that he is reasonably fit for duty. A seaman having such belief is entitled to maintenance and cure and is not precluded from relief for failing to voluntarily disclose any illness or disease, whether existing or pre-existing." Capone, 1989 WL 47387 at *6; see Ahmed v. U.S., 177 F.2d 898 (2d Cir.1949). Therefore, the fact-finder must consider whether the seaman, in good faith, reasonably believed himself fit for duty when he signed aboard for duty. Id. The vessel owner is thus charged with presenting substantial evidence that the seaman was aware that he was unfit for duty. Id.

The parties agree that Defendants did not require Firestone to submit to a pre-hiring medical examination or interview, and Firestone was asked no pre-hire questions concerning his medical history. Firestone did not volunteer his pre-existing medical condition – *i.e.*, that he was 100% disabled. As such, the Court must examine the record to determine: 1) whether Defendants have established that Firestone could reasonably be expected to have considered his medical history a matter of importance to Gibson; and 2) whether there exist reasonable grounds for Firestone to have had a good-faith belief that he was fit for duty.

1.  **Whether Defendants have established that Firestone could reasonably be expected to have considered his medical history a matter of importance to Gibson**

According to Defendants, at the time of his hiring as a crewman on the F/V BILLY B, Firestone failed to disclose that he was disabled and on Social Security Disability and that he suffered from any medical disability – much less a 100% disability rating -- including, but not limited to, previous injuries and degenerative conditions to his lower extremities, diabetes, and circulation problems. Defendants assert that if, at the time he sought employment, Firestone had disclosed his previous medical conditions, his disability, his Social Security status and his medications, he would never have been employed by the Defendants.

The record reveals that in June 2006, Firestone was deemed by an ALJ with Social Security to be 100% disabled, and that his impairments cause significant limitation in his ability to perform basic work activities and he was unable to sustain performance of even sedentary work. (Doc. 38 at 17-23). The ALJ found that Firestone has the residual functional capacity to only lift and carry and push/pull up to 10 pounds occasionally; sit up to 2 hours per 8 hour day; stand and walk up to 2 hours per 8 hour day; and sit, stand and walk in combination for up to 4 hours per 8 hour day. (Id. at 19-20). The ALJ noted that Firestone's condition "is also supported by [Firestone's] daily activities and his credible testimony[]" and that Firestone's "statements concerning the intensity, duration and limiting effects of these symptoms are generally credible." (Id. at 20). Firestone was deemed "disabled" since October 15, 2002. (Doc. 38 at 17-23).

In response, Firestone does not dispute the ALJ's findings and/or that he knew that at the time he sought employment with Gibson and that he had been deemed 100% disabled with chronic conditions and limited work abilities. See e.g., Doc. 40-1 at 8 (Dep. Firestone at 136)). In his response in opposition to summary judgment, Firestone simply asserts, that "as permitted

by the Social Security Regulations and the controlling CFRs, [he] returned to work with the Defendants." (Doc. 40-3 at 1). Firestone, however, has submitted no evidence supporting this assertion. Additionally, at oral argument, Firestone's counsel stated that Firestone had contacted Social Security before seeking employment with Gibson. Again, there is no evidence of record to support this assertion. Moreover, Firestone alleges that Gibson "by virtue of his long relationship with Plaintiff, knew or should have known of Plaintiff's past medical conditions" and that "[e]verybody in Destin, Florida knew I got run over on a motorcycle." (Doc. 40-1 at 8 (Dep. Firestone at 137)). Yet, Firestone simultaneously testified that Gibson "did not know" about his 100% disability rating when he was hired: "No, he didn't know nothing about it, as far as I know." (Id.) Thus, Plaintiff has failed to rebut Defendant's position and the evidence. As such, Defendants have established that Firestone knew he was 100% disabled at the time he was hired, and that this disability rating was based, in part, on his own testimony about what he could and could not do on a daily basis, but that Firestone did not tell Gibson.

Further, the Court's review of the evidence of record also reveals that Firestone (now in his late 40s) has worked as a fisherman on vessels such as the F/V BILLY B since he was a teenager. Firestone then, would be uniquely situated to understand the nature of the physical demands required to work on fishing vessels. Given Firestone's fishing experience, no reasonable factfinder could find that it would be reasonable on Firestone's part to <u>not</u> consider a finding of 100% disability (with limits on work abilities as well as his ability to sit/stand and a less than sedentary work finding) "a matter of importance" to Gibson. See generally Evans, 382 F.2d 637; McCorpen, 396 F.2d 547; Gypsum Carrier, Inc. v. Handelsman, 307 F.2d 525 (9th Cir. 1962); Bergeria v. Marine Carriers, Inc., 341 F. Supp. 1153 (E.D. Pa. 1972); McMillan v. Tug

Jane A. Bouchard, 885 F. Supp. 452 (E.D.N.Y. 1995).

**2.    Whether there exist reasonable grounds for Firestone to have had a good-faith belief that he was fit for duty**

The same holds true as to whether there exist reasonable grounds for Firestone to have a "good-faith belief that he was fit for duty." Firestone was determined to be 100% disabled because of a degenerative chronic condition only 2 years pre-hire. Moreover, Firestone reported to hospital personnel immediately after the alleged incident that: "he "normally" has bad/poor circulation in his right leg (Doc. 38 at 51, 56); his right foot "has been restricted as a foot drop" since the 1991 accident (Doc. 38 at 53); he "thinks he has a blood clot in foot" (Doc. 38 at 55); he "has a long history of chronic injury to this extremity" (Doc. 38 at 62); "by his testimony, [his right foot] is always cold and is always somewhat tender and painful . . he states that his appearance and sensation of the foot is just about in its normal clinical state[]" (Doc. 38 at 62); and his medical history "is significant for peripheral vascular disease[]" (Doc. 38 at 74). Firestone's statements to hospital personnel indicate that he normally has chronic problems with his right leg and it is always tender and painful.

Also, there is nothing in the record suggesting that Firestone even believed (or now claims) that he was fit for duty when hired by Gibson, much less evidence which would support such a belief. Based on the foregoing, the Court finds that there exist no reasonable grounds for Firestone – *a fisherman with over 20 years of fishing experience and who was 100% disabled at the time of pre-hire* – to have had a good-faith belief that he was fit for duty.

As such, summary judgment is due to be granted in favor of Defendants as to Count Two.

## IV. Conclusion

Accordingly, for the reasons set forth herein, it is **ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED** as to Count One (Maintenance and Cure); and Firestone's claims for Jones Act (Count One), unseaworthiness (Count Three), general maritime law/punitive damages (Count Four) and negligence (Count Five) are **DISMISSED with prejudice.** In light of the foregoing, it is further **ORDERED** that Defendant's motion to strike the affidavit of Mark King is **MOOT.**

**DONE** and **ORDERED** this the **12th** day of **November 2010.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**